**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| **SHANE KING** | Case No. 24-cv-1565 |
| Plaintiff, | |
| vs. | |
| **SMURFIT WESTROCK PLC, et al.** | |
| Defendants. | |

**DEFENDANTS' CONSOLIDATED RESPONSE IN OPPOSITION TO PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR FULL**
**SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS**

Defendants Smurfit Westrock PLC ("Westrock") and Phillip Giddens ("Giddens") (collectively "Defendants"), by and through counsel, file their Consolidated Response in Opposition to Plaintiff's Motion for Summary Judgment and Cross-Motion for Summary Judgment in favor of Defendants. For the reasons set forth fully below, this Court should deny Plaintiff's Motion for Summary Judgment and enter summary judgment against Plaintiff on each of his claims.

## I.    STATEMENT OF UNDISPUTED MATERIAL FACTS

### a.    General Employment

1.    Between November 2017 and May 2018, King performed work for Westrock as a temporary Forklift Operator. King was employed by Express Staffing. (Pl. Depo. 6:22-7:9).

2.    On May 16. 2018, Plaintiff was hired as a full-time Forklift Operator for Westrock at its Indianapolis Recycle facility. (Pl. Depo. 7:10-15; Def. Interrogatory Response No. 3).

3.      As a Forklift Operator, Plaintiff was responsible for loading and unloading materials, counting and weighing materials, organizing the materials in the warehouse, and filling out paperwork, such as a bill of ladings, among other tasks. (Pl. Depo. 13:22-25).

4.      Plaintiff worked the first shift, 7:00 a.m. until 4:00 p.m. (Pl. Depo. 13:2-5).

5.      During any given shift, there were approximately six (6) to (9) Forklift Operators working. (Pl. Depo 13:10-19; Giddens Depo. 6:9-13).

6.      At 7:00 a.m. each day, the employees would have a morning meeting to "discuss the prior day's production numbers, […] issues related to safety, and any other thing that might be relevant for that days' work." (Giddens Depo. 7:4-19). The morning meeting was run by the Operations Manager and/or the General Manager of the facility. (Giddens Depo. 7:8-10).

7.      At the beginning of his employment, Plaintiff's general manager was Michelle Taylor.  Phillip Giddens took over as general manager for Westrock's Indianapolis Recycle facility in September of 2022. (Pl. Depo. 14:10-25; Giddens Depo. 7:23-8:1).

**b.  Attendance Policy and Grace Period**

8.      Plaintiff was provided with Westrock's Attendance Policy ("Attendance Policy") during his employment and understood Westrock's expectations with respect to employee attendance. (Pl. Depo. 28:5-29:23). Plaintiff knew that it was important for him to arrive to work on time and work until his scheduled shift ended. (Pl. Depo. 14:1-7).

9.      According to the Attendance Policy, "Consistent and reliable attendance is an important part of each team member's job, and the expectations are that every team member will report to work every scheduled day, on time, and for their full shift." The policy also details attendance point accumulation and the disciplinary repercussions for attendance violations. (Def.

Ex. A - Attendance Policy dated 1/1/2023). According to the Attendance Policy, accruing 10 attendance points warrants termination. (*Id.*).

10.    Westrock has an electronic timekeeping system that monitors attendance. This system will automatically assign attendance points in accordance with the Attendance Policy if an employee clocks in late, calls off more than 60 minutes in advance of their shift, or does not clock in at all. There are times when the points assigned by the system must be manually adjusted, such as when an employee calls off less than 60 minutes in advance of their scheduled shift. (Giddens Depo. 11:4-12:8).

11.    When employees clock in or out, they have the ability to type in their Employee ID and view their attendance points. (Pl. Depo. 25:1-10). Plaintiff was able to track his attendance points, however, he did "not [check] very often". (Pl. Depo 36:25-37:18).

12.    While Giddens was the general manager of the Indianapolis Recycle facility, he implemented a "grace period" for employees. (Pl. Depo. 21:15-22:17; Giddens Depo. 88:1-89:15). The grace period allowed employees to clock in until 7:07 a.m. without being considered late and accumulating half of an attendance point. (Giddens Depo. 88:1-89:15). Either Giddens or his office manager would manually remove the attendance point from an employee's attendance record if they clocked in within the grace period. (Giddens Depo. 89:24-90:7, 92:10-17).

13.    Giddens applied the grace period equally among employees. (Giddens Depo. 92:22-24). Plaintiff was "frequently the most frequent flyer when it came to taking advantage of that grace period. […] [The team] would routinely have to wait for [Plaintiff] to arrive because he took the grace period as being his de facto start time. So he would frequently show up well after 7:00 in the morning, and oftentimes after that grace period ended at 7:07". (Giddens Depo 88:23-89:11).

### c. Plaintiff's Attendance and Disciplinary Actions

14.     At the time Giddens became the general manager of the Indianapolis Recycle facility, employees were to receive one 30-minute lunch break and two 15-minute breaks throughout the day. However, Plaintiff would leave for between 60 and 90 minutes in the middle of the day, without recording his time away, to take care of a puppy. Giddens had to personally step in and end Plaintiff's practice of leaving for extended periods of time during the middle of the day as it was not fair to other employees and hindered the facility from meeting daily production goals. (Giddens Depo. 35:12-36:12). It is also tantamount to stealing time when he did not clock out for the additional time.

15.     On March 6, 2023, Plaintiff was given a verbal warning for showing up over two and a half hours late to a mandatory Saturday overtime shift. (ECF No. 53-6, PAGEID 441; Giddens Depo. 43:1-44:4). After Plaintiff failed to arrive on time for his Saturday shift, Giddens implemented a policy "so that everyone was fully aware that when they were scheduled to work on a Saturday, they had to be there for their shift as if it were a Monday through Friday shift." (Giddens Depo. 43:21-44:4; Def. Ex. B - Saturday Work Schedule Policy).

16.     On November 13, 2023, Plaintiff was given a written warning for the following attendance violations: "Per the WestRock Attendance Policy dated 1/1/2023 and implemented 6/1/2023, employee has accumulated 6.5 attendance points at this time. Employee called in sick on 6/7 and again on 9/29. Employee arrived late on 7/10/2023, 7/18/2023, 7/26/2023, 8/23/2023, 10/3/2023 and 10/9/2023 for a total of 3.5 points. Employee left prior to the end of their shift on 6/30/23 and again on 10/30/2023 for an additional one point or a total of 6.5 points as of this date." Plaintiff acknowledged his understanding that continued failure to comply with the Attendance

Policy will lead to further disciplinary action, up to and including termination. (ECF No. 53-6, PAGEID 437-438).

17.    On December 13, 2023, Plaintiff was issued a "2nd written or Final Written Warning" and was suspended for three (3) working days due to further attendance issues. In addition to the attendance violations, in the November 13, 2023 written warning, "Employee again called in sick on 12/11/2023 and 12/12/2023 for a current total of 8.5 points to date." Plaintiff again acknowledged his understanding that continued failure to comply with the Attendance Policy will lead to further disciplinary action, up to and including termination. (ECF No. 53-6, PAGEID 434-435).

18.    On December 18, 2023, Giddens and Plaintiff went over Plaintiff's 2023 Hourly Performance Appraisal. Plaintiff met Defendant's expectations in all areas except for one – Attendance. Giddens gave him a rating of 1 out of 5 and mentioned that "Attendance is an area where [Plaintiff] has considerable room for improvement." (Def. Ex. C - 2023 Hourly Performance Appraisal of Shane King).

19.    On March 15, 2024, Giddens issued Plaintiff a Final Warning. At the time of the final warning, Plaintiff had accrued 13 attendance points.  In addition to the previous violations listed on the December 13, 2023 "2nd written or Final Written Warning," Plaintiff was late to work on 1/24/24, 2/13/24, 2/17/24, and 3/5/24 and was absent without scheduling on 3/14/24.  (ECF No. 53-6, PAGEID 432-433).

20.    Although the Attendance Policy states that 10 attendance points results in termination, Giddens elected to issue a final warning on March 15 instead due to a delay in delivering the final warning prior to the 10th accrued point. By doing this, Giddens hoped that he could impress upon Plaintiff the importance of attendance to develop Plaintiff into a more reliable

and productive team member. (ECF No. 53-6, PAGEID 432-433; Giddens Depo. 34:3-12, 37:7-14).

21.    Plaintiff contends that he never received the March 15, 2024, final warning and he believes his signature was forged because his signature is "meshed with this second signature below it, and [Plaintiff has] never seen this [March 15, 2024 final warning], and [Plaintiff does not] remember ever being told [he] was at 13 points." (Pl. Depo. 36:10-22). However, Plaintiff does not dispute the accuracy of anything written on the March 15, 2024 final written warning. (Pl. Depo. 37:19-38:13).

22.    After the final written warning, Plaintiff was late on April 4, 2024 and April 19, 2024. (ECF No. 53-3; Def. Ex. D - Westrock's Accrual Banks Detail Spreadsheet between 1/1/2024 and 12/31/2024 at Westrock 860). Additionally, Plaintiff came to work without the proper PPE on July 2, 2024. Due to the July 2 violation, Plaintiff was sent home to which Plaintiff responded by saying that if he was sent home he was not returning to work. Plaintiff accrued an unexcused absence for the day. (ECF No. 53-3; Def. Ex. D at Westrock 860). Plaintiff also received .5 attendance points on July 15, 2024 for being late. (Def. Ex. D at Westrock 860).  Despite accruing additional points following his Final Warning, Plaintiff was not terminated at this time. Giddens was trying to give King ample opportunity to improve his attendance and performance. (Giddens Depo. 34:3-17, 35:3-10, 37:7-38:1).

23.    Prior to issuing any form of disciplinary action to Plaintiff due to attendance, Giddens would validate the dates that Plaintiff was either late or absent by going back and looking at "each week's attendance to see when he clocked in, if he clocked in, [and] when he clocked out." (Giddens Depo. 91:16-92:2).

24.     Each time Plaintiff was absent or late, it had a big effect on the rest of the team and production. "Plaintiff was one of the primary operators on what we call our south dock, and so when anyone is absent and it is unscheduled, we have to make kind of emergency adjustments, and it could negatively impact inbound material, outbound loads." (Giddens Depo. 102:3-103:7). It also impacted the team as "a number of employees voiced – regularly voiced frustration with [Plaintiff]. It reached a point where it was […] kind of a frustrating joke that we were always waiting on [Plaintiff] to show up in the morning, and there was just no surprise when he didn't show up." (*Id.*). "He just could not make it to work on time, and it was beginning to have a negative effect on the entire team." (Giddens Depo. 37:7-24, 103:21-104:11).

**d. Plaintiff's Termination**

25.     Plaintiff was over an hour late to work on both August 8, 2024 and August 9, 2024. (Def. Ex. D at Westrock 860; Def. Ex. E – Westrock's Timesheet Exceptions Spreadsheet between 1/1/2024 and 12/31/2024 at Westrock 689; Pl. Depo. 47:23-25; Giddens Depo. 37:7-19; Def. Ex. F - Text Messages between Shane King and Manager Chris Pflum at Westrock 574-575).

26.     After Plaintiff was late on August 8, 2024, Giddens had a conversation with Plaintiff about the importance of adhering to the Attendance Policy. However, Plaintiff's demeanor clearly showed that this was not important to him. (Giddens Depo. 109:13-24).

27.     These two absences were blatant violations of the Attendance Policy and the last straw for Giddens as he finally realized that Plaintiff was never going to abide by the Attendance Policy. (Giddens Depo. 35:3-10, 37:7-38:1, 39:14-25, 99:16-101:2, 109:13-110:4). Accordingly, on August 9, 2024, Giddens made the decision to terminate Plaintiff based on Plaintiff's consistent failure to adhere to the Attendance Policy. (Giddens Depo. 27:14-18, 30:18-31:2,

99:16-101:2, 108:17-22, 109:13-110:4; Pl. Depo. 60:22-25; ECF No. 53-2; ECF No. 54, PAGEID 495; Kennedy Decl. ¶6).

28.     When Giddens makes the decision to terminate an employee, he submits documentation supporting the termination to Human Resources. Human Resources reviews the documents, asks questions on the documents if necessary, and then either supports or does not support the termination decision. If the termination decision is supported, Giddens would then inform the employee of their termination. (Giddens Depo.  28:23-30:11; Kennedy Decl. ¶5).

29.     Consistent with Defendant's termination practice, after Giddens made the decision to terminate Plaintiff, he reached out to Human Resources Manager Mark Kennedy ("Kennedy") stating, "If you have a chance today I'd like to discuss [Plaintiff]. [Plaintiff] was roughly an hour late yesterday and he's not here yet today again. I think he believes that he's now immune from any action having filed to STD and it's having a negative effect on my entire team. My concern is that this will continue up to the date of his surgery while the remainder of the team sees this and perceives that there are no consequences for him. I feel like we need to take some sort of action now depending on how Legal views the situation." (ECF No. 53-2, PAGEID 157-159).

30.     Giddens raised the possibility of terminating Plaintiff with Kennedy and provided him with documentation of Plaintiff's attendance issues. (Giddens Depo. 27:22-28:4, 110:2-4; Kennedy Decl. ¶¶6-7). Plaintiff's previously scheduled medical leave and upcoming medical leave had no bearing on the decision to terminate Plaintiff. (Giddens Depo. 30:21-31:2, 37:7-38:1, 39:23-40:13, 110:2-111:13; Kennedy Decl. ¶¶12-13).

31.     After Giddens made the recommendation to terminate Plaintiff's employment on August 9, 2024, he waited for further guidance from Human Resources. (Giddens Depo. 27:14-28:6, 29:18-30:11, 40:18-41:9).

32.     Human Resources reviewed Gidden's termination request along with the documentation supporting his termination for attendance, including the warnings and documentation demonstrating his current points pursuant to the Attendance Policy, to ensure that the termination was not violative of any of Plaintiff's rights, particularly in light of Plaintiff's upcoming FMLA leave. (ECF No. 53-2; Giddens Depo. 26:23-27:11, 27:24-28:6, 29:1-30:3, 77:8-78:8; Kennedy Decl. ¶¶5-14)

33.     Human Resources supported Gidden's decision to terminate Plaintiff's employment on August 20, 2024. (Giddens Depo. 27:14-18, 30:6-17; Kennedy Decl. ¶10). Plaintiff's termination was effective August 20, 2024 because that is when his termination was approved. (Giddens Depo 9:24-10:18, 27:14-18; Pl. Depo. 73:15-74:9; ECF No. 53-7, PAGEID 444; Kennedy Decl. ¶¶10-14).

34.     Plaintiff's last day worked was August 20, 2024. (Pl. Depo. 67:17-18; Kennedy Decl. ¶14). Plaintiff did not speak with Giddens prior to leaving on August 20, 2024. (Pl. Depo. 66:9-67:11).

35.     On August 21, 2024, Giddens tried to contact Plaintiff to notify him of the termination.  But Giddens was unable to reach plaintiff until August 22, 2024. (Giddens Depo 9:24-10:18, 27:14-21, 30:6-17). Giddens informed Plaintiff that he was being terminated due to attendance violations. (Pl. Depo. 60:22-25). Plaintiff's leave approval status had no bearing on Defendants' decision to terminate Plaintiff. (ECF No. 53-3; Giddens Depo. 75:3-76:5, 101:14-21, 110:8-111:13).

36.     A little over a month prior to Plaintiff's termination, on July 10, 2024 Giddens terminated another Senior Forklift Operator for his attendance violations. (Def. Ex. G - Westrock's Indianapolis Recycling Facility Terminations by Giddens in 2023 and 2024 at

Westrock 990-994; Giddens Depo. 93:1-16). This employee did not have a pending FMLA or STD claim at the time of his termination. (Giddens Depo. 20:14-18, 21:10-13).

### e. **Plaintiff's Leave of Absence**

37.    Plaintiff was diagnosed with a hernia in the first week of July 2024. 48:9-15. Plaintiff contacted Defendant Westrock's office manager and asked her what he needed to do to request medical leave. The office manager gave him the contact information for Sedgwick, Defendant's third-party benefits administrator ("TPA"). (Pl. Depo. 48:16-49:1, Giddens Depo 14:7-14; Plaintiff's MSJ, p.3; Def. Ex. H – Shane King Initial Claim Report dated 7/9/2024 at Westrock 375-379; Def. Ex. I - Request for Medical Information dated 8/27/2024 at Westrock 480-485; Def. Ex. J - Westrock's Family Medical Leave Act Policy dated 5/1/2023 at Westrock 1031-1035; Def. Ex. K – Westrock's Americans with Disabilities Act & Family Medical Leave Act Review for Managers dated 1/2024 at Westrock 1047; Def. Ex. L – Pl. Prod. 2024.10.23 Westrock Statement of Benefits; Def. Ex. M – Pl. Prod. 2024.08.14 Sedwick Claim Booklet).

38.    As Westrock's TPA, Sedwick administers its FMLA program and self-funded STD insurance, including receipt, evaluation, and response to employee requests for FMLA or STD. (Def. Ex. I at Westrock 481; Def. Ex. J at Westrock 1035; Def. Ex. K at Westrock 1047).

39.    Westrock provides its self-funded STD insurance to its employees. (Def. Ex. I at Westrock 481; Def. Ex. L).

40.    On July 9, 2024, Plaintiff opened a medical leave request with Sedgwick. (Pl. Depo. 48:16-49:1, 48:14-18). Plaintiff notified Sedgwick that he was having surgery on July 25, 2024, with an expected return to work date of August 16, 2024. (Pl. Depo 49:14-50:11).

41.    A couple days after initiating his leave request with Sedgwick, Plaintiff provided Giddens with a time off request form. (Pl. Depo. 50:12-17; Giddens Depo. 14:10-15:9).

42.    On July 24, 2024, Plaintiff received a call from his doctor to reschedule Plaintiff's surgery because his doctor was ill. (Pl. Depo. 53:13-54:16).

43.    Contrary to Plaintiff's assertions, Plaintiff did not work on July 25, 2024. Plaintiff messaged Chris Pflum and Giddens approximately one hour before the start of his shift to inform them that he would not be coming into work that day. (Def. Ex. D at Westrock 860; Def. Ex. N - Text Messages between Shane King and Manager Chris Pflum dated 7/25/2024 at Westrock 000577; Pl. Depo. 53:13-54:16). While this warranted a half attendance point, Plaintiff was not penalized. (ECF No. 53-3; Def. Ex. D at Westrock 860).

44.    Plaintiff's surgery was rescheduled to August 21, 2024, and his new expected return to work date was September 20, 2024. (Pl. Depo 53:13-54:20; ECF No. 53-7). On August 5, 2024, Plaintiff provided Giddens with a time off request form for this time period. (ECF No. 53-1). Giddens approved Plaintiff's time off request. (ECF No. 53-1; Pl. Depo. 19:4-13).

45.    Between August 5, 2024 and August 20, 2024, Giddens communicated with the Human Resources Department regarding the status of Plaintiff's leave and would provide Plaintiff with updates as to the approval status of his leave. (Giddens Depo. 20:4-8, 98:5-99:2; Pl. Depo. 58:22-59:18).

46.    Giddens provided status updates to Plaintiff as he wanted to ensure Plaintiff did everything, he needed to do to get his leave approved. (Giddens Depo. 98:5-99:2). Giddens believed that Plaintiff had to provide documentation for Plaintiff's leave prior to taking leave because that was Giddens' experience when he had taken a medical leave. (Giddens Depo. 19:4-20:18, 98:5-99:2). Giddens was not told to penalize Plaintiff for any absences due to his surgery if Plaintiff's leave was not approved prior to the beginning of his leave. (Giddens Depo. 26:23-27:7).

47.    On August 22, 2024, during Giddens' termination conversation with Plaintiff, Giddens' provided Plaintiff with another update that his leave had not been fully approved. (Pl. Depo. 57:10-20, 60:6-13; Giddens Depo. 73:23-20, 98:16-99:2, 101:14-21).

48.    On August 22, 2024, Plaintiff notified Sedgwick that he was terminated and called to check to see if his claim was still pending. Plaintiff also asked about his STD pay since he was terminated. Sedgwick stated that his claim was still pending. Plaintiff again requested that Sedgwick fax his doctor the medical paperwork. Sedgwick contacted the Company the next day to check on termination status. (ECF No. 53-7, PAGEID 446-447; ECF No. 53-11, PAGEID 490-491).

49.    On August 26, 2024, the Office Manager contacted Kennedy requesting clarification on what the payroll code should be for August 21-23, 2024, as she was completing payroll for that period. (ECF No. 53-11, PAGEID 479). Kennedy suggested that they use an FMLA Pending code if it existed, or code it as an absence as Plaintiff's FMLA was not fully approved at that time. (*Id.*).

50.    On August 27, 2024, a Senior Human Resources Specialist informed Kennedy that Plaintiff was still coded as on a leave of absence. She wanted advice from Kennedy on the proper termination code for Plaintiff in their system because the only options that she was given was "Vol Fail to Return from Leave & Failure to Return from Disability." (ECF No. 53-11, PAGEID 484).

51.    On August 28, 2024, Kennedy reached out to the Human Resources Operations Manager to see if she would be able to revise or remove the Leave of Absence termination codes, as they "do not accurately reflect the reason for termination." (ECF No. 53-11, PAGEID 484). Kennedy specifically stated that the termination request was for violation of the Attendance Policy. (ECF No. 53-11, PAGEID 483).

52.     The Senior Human Resources Specialist responded clarifying that since Plaintiff was coded on a Leave of Absence, they would need to have "benefits enter a row stating he either returned or was denied STD." Only then could they enter the termination as "Term/Attendance". (ECF No. 53-11, PAGEID 482-483).

53.     On August 28, 2024, Sedgwick again emailed the Company requesting confirmation of Plaintiff's termination. (ECF No. 53-11, PAGEID 490-491).

54.     On August 30, 2024, Defendants informed Sedgwick that Plaintiff was terminated effective August 20, 2024, Plaintiff's last day worked, and that the date that the decision was made to terminate Plaintiff was August 9, 2024. (ECF No. 53-7, PAGEID 443-444; Giddens Depo 9:24-10:18, 27:14-18; Pl. Depo. 53:23-24; 73:15-74:9). It is important to note that Plaintiff worked between August 9, 2024 and August 20, 2024. Therefore, his termination date could not be effective before his last day worked because it would affect his payment. (Kennedy Decl. ¶¶10-14).

55.     That same day, Sedgwick closed Plaintiff's claim. (ECF No. 53-7, PAGEID 444).

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment should be granted where the pleadings, responses to discovery, depositions, affidavits, and declarations, if any, establish that "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). The Supreme Court has explained that "[a]t the summary judgment stage, facts must be viewed in the light most favorable to the non-moving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Once the moving party has put forward a record demonstrating there are no issues as to any material facts, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Summary judgment remains appropriate even where "*some* alleged factual dispute [exists] between the parties" because "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Furthermore, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

III.    **ARGUMENT**

    a.  **Defendants are Entitled to Summary Judgment on Plaintiff's FMLA Related Claims.**

In his Motion for Summary Judgment and Brief in Support ("Plaintiff's Motion"), Plaintiff requests that the Court grant summary judgment to Plaintiff on his FMLA interference and retaliation claims. However, Plaintiff's Motion is riddled with conclusory statements and mischaracterizations of the clear, objective facts. In reviewing the record, it is apparent that Defendants did not interfere with or retaliate against Plaintiff with respect to his FMLA rights. Rather, Plaintiff was terminated for his long-time pattern of unacceptable attendance which was wholly unrelated to his request for FMLA. Accordingly, the Court should deny Plaintiff's Motion and grant summary judgment on Plaintiff's FMLA related claim in favor of Defendants.

        *i.  Defendants did not interfere with Plaintiff's FMLA benefits.*

In Plaintiff's Motion, Plaintiff wants the Court to disregard the documentary evidence and sworn testimony that definitively contradicts Plaintiff's unsupported supposition that he was terminated for the purpose of interfering with his rights under the FMLA. This would be inappropriate, as the undisputed material facts fail to show any evidence to support Plaintiff's claim of FMLA interference.

14

In order to establish an FMLA interference claim, Plaintiff must prove that: (1) [he] was eligible for the FMLA's protections; (2) [his] employer was covered by the FMLA; (3) [he] was entitled to leave under the FMLA; (4) [he] provided sufficient notice of [his] intent to take leave; and (5) [his] employer denied [him] FMLA benefits to which [he] was entitled." *Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 498 (7th Cir. 2014), quoting *Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 761 (7th Cir. 2008). Plaintiff contends that Defendants interfered with his FMLA rights because Plaintiff was notified of his termination while on leave. However, "[a]n employee's right to return to work after taking leave is not unlimited; he is not entitled to 'any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave.'" *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 636 (7th Cir. 2009) (quoting 29 U.S.C. § 2614(a)(3)(B)). "[A]n employee may be fired for poor performance when she would have been fired for such performance even absent her leave." *Kohls v. Beverly Enters. Wis., Inc.*, 259 F.3d 799, 805 (7th Cir. 2001).

In *Cracco*, the defendant terminated the plaintiff's employment the day he returned from FMLA leave. 559 F.3d at 636. The Court reasoned that the plaintiff was not entitled to reinstatement as defendant determined, after an investigation, that plaintiff failed to adequately perform his work duties before his FMLA leave began. *Id*. Moreover, the plaintiff did not put forth any evidence demonstrating that the performance issues did not take place, nor did plaintiff bring forth any evidence to support the fact that he would have retained his job after he took FMLA leave. Accordingly, the Court affirmed the district court's decision to grant summary judgment in favor of the defendant. *Id*.

Similarly, in *McBeath v. City of Indianapolis*, the Southern District of Indiana's Chief Judge Tanya Walton Pratt granted summary judgment in favor of the defendant on an FMLA

interference claim. 2024 U.S. Dist. LEXIS 78342 (S.D. Ind. Apr. 29 2024). In *McBeath*, the defendant terminated plaintiff during her FMLA leave as they discovered misconduct, which Plaintiff committed before going on leave, after she began her leave. *Id*. at *14-18. Summary judgment was granted as the plaintiff "has presented no evidence that would lead a reasonable trier of fact to conclude that she did not violate Indy Parks' company policies or that she would have retained her job had she not taken FMLA leave". *Id*. at *18.

Like *Cracco* and *McBeath*, Plaintiff was terminated for his violations of company policy, specifically the Attendance Policy. Plaintiff does not dispute his poor attendance record, nor does he dispute that Giddens informed him that he was terminated for his attendance. Rather, he argues that because he had not previously been terminated it must be that he was terminated due to his leave. However, this could not be further from the truth. Prior to Plaintiff's termination, Plaintiff was issued several warnings for attendance, suspended due to his attendance violations, and issued a final warning where he was put on notice that further violation may result in termination. While Giddens continued to afford Plaintiff leeway, he finally had enough after Plaintiff was over an hour late on two consecutive days almost three weeks before his scheduled procedure. It was then that Giddens realized, after he had just spoken to Plaintiff regarding his adherence to the Attendance Policy, that Plaintiff was not going to change. Moreover, Plaintiff's complete disregard for and abuse of the Attendance Policy began having a negative impact on the team and production goals. Accordingly, Giddens made the decision to terminate Plaintiff on August 9, 2024 and, consistent with company practice, waited to notify Plaintiff of his termination until his decision was reviewed and supported by Human Resources. Once the termination decision was finalized, Giddens attempted to, and eventually did, notify Plaintiff of his termination.

The undisputed material facts show that Plaintiff's termination was based on Plaintiff's continued blatant violations of the Attendance Policy, which impacted the morale of his team and their ability to meet production goals. Thus, Plaintiff was no longer entitled to his position. Accordingly, the Court should deny Plaintiff's Motion and grant summary judgment in favor of Defendants on Plaintiff's FMLA interference claim.

## ii. Defendants did not retaliate against Plaintiff.

Plaintiff also alleges FMLA retaliation against Westrock and Giddens. "The difference between a retaliation and interference theory is that the first 'requires proof of discriminatory or retaliatory intent while [an interference theory] requires only proof that the employer denied the employee his or her entitlements under the Act.'" *Goelzer v. Sheboygan County*, 604 F.3d 987, 995, 2010 U.S. App. LEXIS 9654, *19 (7th Cir. 2010), quoting *Kauffman v. Fed. Express Corp*., 426 F.3d 880, 884, 2005 U.S. App. LEXIS 22386, *10 (7th Cir. 2005). For Plaintiff to establish a *prima facie* case of FMLA retaliation, Plaintiff must prove: (1) he engaged in statutorily protected activity; (2) Westrock and/or Giddens took an adverse employment action against him; and (3) the protected activity caused the adverse action. *Freelain v. Vill. of Oak Park*, 888 F.3d 895, 900-01 (7th Cir. 2018). Defendants acknowledge that Plaintiff meets the first two elements, however, the undisputed facts prevent Plaintiff from establishing the third element as there is no evidence that Plaintiff's FMLA request played any role in Defendants' decision to terminate his employment.

While Plaintiff does not need to prove that "retaliation was the only reason for [his] termination; [he] may establish an FMLA retaliation claim by 'showing that the protected conduct was a substantial or motivating factor in the employer's decision.'" *Goelzer*, 604 F.3d at 995, quoting *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 741 (7th Cir. 2008). As discussed in the preceding section regarding Plaintiff's FMLA interference claim, Plaintiff's exercise of his rights under the

FMLA was not a factor in his termination. The undisputed evidence shows Plaintiff had attendance problems throughout his employment with Westrock, so much so that within a year of his termination he received several warnings, a suspension, and a final written warning all due to his continued violations of the Attendance Policy. After receiving a final written warning, Plaintiff was still provided leeway with his sporadic attendance violations, some of which even occurred after he notified Defendants of his intent to take medical leave. It was not until Plaintiff had back-to-back days of being over an hour late on August 8 and 9, 2024, that Giddens decided to terminate Plaintiff's employment. Giddens even tried to give Plaintiff a little more leeway after he was late on August 8, 2024 and he spoke with Plaintiff regarding his attendance. However, Plaintiff was disinterested and dismissive of Giddens' work concerns. At that point Giddens had enough and began the termination process.

In Plaintiff's Motion, Plaintiff erroneously alleges that Defendants terminated Plaintiff for his "unapproved" absence on August 21, 2024. This directly contradicts the evidence in this case, and even the facts as alleged in Plaintiff's Motion, that the decision to terminate Plaintiff's employment was made by Giddens on August 9, 2024 and then supported by Human Resources on August 20, 2024. There is no evidence to support that Plaintiff's absence on August 21 and 22, 2024 were factors in Plaintiff's termination.

Additionally, in Plaintiff's Motion, Plaintiff attempts to use Defendants discussions surrounding whether his leave was approved by Sedgwick to support his claims. However, this is contrary to the evidence. First, Giddens would receive updates from Westrock's Human Resources department and would then provide updates to Plaintiff. Giddens wanted to ensure that Plaintiff had submitted all necessary documents for his leave because, with Gidden's experience with his own leave, he believed that for leave to be approved, documentation may have to be submitted

prior to the leave. There is no indication or evidence supporting the notion that Giddens was going to penalize Plaintiff for being absent for his surgery. Even during the termination call, Giddens provided Plaintiff with an update that his leave was not approved yet so that Plaintiff could check on the status, which he did immediately after the termination call. Both parties agree that Plaintiff was told that he was terminated due to his attendance, not due to his leave. Finally, the emails referenced by Plaintiff in Plaintiff's Motion clearly discuss how to code Plaintiff's termination for attendance in Westrock's system since he was coded on being on a protected leave of absence. Plaintiff's arguments are misguided and clearly contrary to the undisputed facts.

The facts clearly show that Giddens decided to terminate Plaintiff on August 9, 2024 due to his consistent violations of the Attendance Policy. It is undisputed that prior to the termination decision Plaintiff was disciplined several times, including a suspension and a final warning. After Gidden's communicated his decision to terminate Plaintiff to Westrock's Human Resources Department, Human Resources reviewed documents supporting Giddens' decision and supported the termination on August 20, 2024. By the time the termination was approved, Giddens' did not see Plaintiff before he left work on August 20, 2024, and could not get ahold of him to inform Plaintiff of his termination until August 22, 2024. Plaintiff's termination was due solely to Plaintiff's attendance violations on and before August 9, 2024. Plaintiff's exercise of his FMLA rights had nothing to do with his termination, Plaintiff has no evidence to support his contention besides his own assumptions.

"Summary judgment for the employer is proper where the employer provides undisputed evidence that the adverse employment action is based upon the employee's poor job performance." *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 221 (7th Cir. 2015); *see also Long v. Teachers' Ret. Sys. of Ill.*, 585 F.3d 344, 354 (7th Cir. 2009) ("a decline in performance before the employee

engages in protected activity does not allow for an inference of retaliation."). Therefore, the Court should deny Plaintiff's Motion and summary judgment should be granted in favor of Defendants on Plaintiff's retaliation claim under the FMLA.

      **b.  The Court Should Grant Summary Judgment in Favor of Defendants on Plaintiff's Breach of Contract and Tortious Interference Claims.**

      *i.  Defendants did not breach any contract with Plaintiff.*

For Plaintiff to prevail on his breach of contract claim, he "must prove the existence of a contract, the defendant's breach of that contract, and damages resulting from the breach." *Haegert v. Univ. of Evansville*, 977 N.E.2d 924, 937 (Ind. 2012). In the present matter, Plaintiff identified the contract at issue to be an "implied contract" that would allow Plaintiff to "maintain his employment." ECF No. 37. Thus, he is asserting a form of employment contract with Defendants. According to the Indiana Supreme Court:

> Historically, Indiana has recognized two basic forms of employment: (1) employment for a definite or ascertainable term; and (2) employment at-will. If there is an employment contract for a definite term, and the employer has not reserved the right to terminate the employment before the conclusion of the contract, the employer generally may not terminate the employment relationship before the end of the specified term except for cause or by mutual agreement. If there is no definite or ascertainable term of employment, then the employment is at-will, and is presumptively terminable at any time, with or without cause, by either party.

*Orr v. Westminster Village North*, 689 N.E.2d 712, 717 (Ind. 1997). In Indiana, "the presumption of at-will employment is strong." *Id*. "The employment-at-will doctrine is a rule of contract construction, not a rule imposing substantive limitations on the parties' freedom to contract." *Id*., citing, *Streckfus v. Gardenside Terrace Co-Op. Inc*., 504 N.E.2d 273, 275 (Ind. 1987). Plaintiff has not brought forth any evidence that this Court should not deem his employment to be anything other than "at-will." Accordingly, Defendants were able to terminate his employment at any time,

with or without cause. Summary judgment should be granted to Defendants on Plaintiff's breach of contract claim.

*ii. ERISA Preempts Plaintiff's Tortious Interference Claim.*

In this action, Plaintiff contends that Defendants "tortiously interfered with the provision of benefits by the third-party provider" (ECF No. 1, ¶14), specifically, Plaintiff's "right to receive short-[term] disability benefits from a third-party provider" (ECF No. 37, ¶4). However, this is precisely the type of claim that is preempted by the Employee Retirement Income Security Act ("ERISA").

"ERISA is one of the few areas of law subject to 'field' preemption, which 'occurs when federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation.'" *Di Joseph v. Std. Ins. Co.*, 776 Fed. Appx. 343, 347-348, 2019 U.S. App. LEXIS 17127, *8-10 (7th Cir. 2019), quoting *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1480, 200 L. Ed. 2d 854 (2018). ERISA provides for broad preemption of state law claims, stating that it "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 4(a) [29 USCS § 1003(a)] and not exempt under section 4(b) [29 USCS § 1003(b)]." 29 USCS § 1144(a). An "employee benefit plan" is defined as "any plan, fund, or program . . . established or maintained by an employer or by an employee organization […] for the purpose of providing its participants or their beneficiaries […] benefits in the event of sickness, accident, disability, death or unemployment […]." 29 USCS § 1002(1). Defendant's short term disability plan falls squarely within the definition of an "employee benefit plan," thus this Court should grant summary judgment on Plaintiff's state law claim of tortious interference as it is wholly preempted by ERISA. *See* Crabtree v. Life Care Ctrs. of Am., Inc., 2009 U.S. Dist. LEXIS 25454, 2009 WL 734726 (S.D. Ind. March 18, 2009)(short

term disability plan fell within the purview of ERISA, thus plaintiff's state law claims of wrongful termination, breach of implied contract, tortious interference with a contract, and intentional infliction of emotional distress were preempted by ERISA); *Bickel v. Liberty Mut. Group, Inc.*, 2010 U.S. Dist. LEXIS 124881, *9, 2010 WL 4923035 (S.D. Ind. Nov. 23, 2010) (summary judgment granted on plaintiff's state law claims as they were preempted by ERISA); *Di Joseph*, 776 Fed. Appx. 343 (the underlying theory of plaintiff's state law claims against defendant was that defendant improperly denied plaintiff of long term disability benefits, thus plaintiff's state law claims are preempted by ERISA); *Blau v. Del Monte Corp.*, 748 F.2d 1348, 1356, 1984 U.S. App. LEXIS 16179, *24 (9th Cir. 1984) (plaintiff's state common law causes of action for breach of contract implied in fact, promissory estoppel, estoppel by conduct, fraud and deceit, and breach of contract were preempted by ERISA); *Dependahl v. Falstaff Brewing Corp.*, 653 F.2d 1208, 1215-16 (8th Cir.), *cert. denied*, 454 U.S. 968, 102 S. Ct. 512, 70 L. Ed. 2d 384 (1981) (ERISA preempts common law claim of tortious interference).

> *iii. Defendants did not tortiously interfere with Plaintiff's right to receive disability benefits.*

To establish a claim of tortious interference with contract under Indiana law, ""a plaintiff must show: 1) existence of a valid and enforceable contract; 2) defendant's knowledge of the existence of the contract; 3) defendant's intentional inducement of breach of the contract; 4) the absence of justification; and 5) damages resulting from defendant's wrongful inducement of the breach." Partin v. Baptist Healthcare Sys., Inc., 135 F.4th 549, 563, 2025 U.S. App. LEXIS 9812, *20-21 (7th Cir. 2025), quoting *Am. Consulting, Inc. v. Hannum Wagle & Cline Eng'g, Inc.*, 136 N.E.3d 208, 214 (Ind. 2019). While there was a valid contract in this matter, the alleged short term disability contract in question is between Defendant Westrock and Plaintiff. As the Supreme Court of Indiana recognizes, "a party cannot interfere with its own contracts, […] only

third parties can commit tortious interference with contract." *Martin v. Copeland*, 2017 U.S. Dist. LEXIS 6010, *5-6 (N.D. Ind. Jan. 17, 2017), citing *Trail v. Boys & Girls Clubs*, 845 N.E.2d 130, 138 (2006). Accordingly, Plaintiff cannot sustain a tortious interference claim against Defendant Westrock.

With respect to Defendant Giddens, Plaintiff's tortious interference claim similarly fails. Defendant Giddens, as an agent of Westrock, can only be held personally liable for tortious interference if Plaintiff demonstrates "some interfering act […] that rests outside [his] authority as [an agent] of the corporation." *Trail*, 845 N.E.2d at 138. This is because "when officers or directors act in their official capacity as agents of the corporation, they act not as individuals but as the corporation itself. In doing so, they are not acting as a third party, but rather as a party to the contract and cannot be personally liable for tortious interference with the contract." *Id*.

In *Trail*, the Supreme Court of Indiana determined that an Executive Committee member acted within the scope of their authority when they asked the plaintiff to resign because the Executive Committee possessed the power to terminate plaintiff. The Court in Trail reached its conclusion citing the holding in *Martin v. Platt,* 179 Ind. App. 688, 386 N.E.2d 1026 (1979), where the Court of Appeals held a supervisor cannot be liable for tortious interference when he fires an employee, regardless of his motivations, if the supervisor, in his ordinary duties, possessed the authority to terminate the employee. The Southern District of Indiana has followed the decision in Trail. In *Rule v. Mainstreet Capital Partners LLC*, the Court determined that "under Indiana law neither the action of trying to manufacture a reason to terminate Plaintiff nor the motive of personal, conspiratorial desire can take the Defendants outside of their official capacity as agents of the corporation." 2019 U.S. Dist. LEXIS 23009, *7 (S.D. Ind. Feb. 13, 2019). Similar to *Trail*, *Martin*, and *Rule*, there is no dispute that Defendant Giddens, as Westrock's Plant Manager, had

the authority to terminate employees, including Plaintiff. Moreover, Plaintiff has not alleged, nor provided any evidence demonstrating that Defendant Giddens acted outside the scope of his employment when he terminated Plaintiff. Thus, Plaintiff's tortious interference claim against Defendant Giddens fails.

## IV.    **<u>CONCLUSION</u>**

It is clear, upon review of Plaintiff's Complaint, Plaintiff's Motion and the evidence presented in this case that Plaintiff's claims are supported only by his own speculation and interpretation of Defendants' actions. This is simply insufficient for Plaintiff's claims to survive summary judgment. For this reason, and the reasons described above, Plaintiff's claims lack any merit and Defendants respectfully request that this Court deny Plaintiff's Motion and grant Defendants' Motion for Summary Judgment in its entirety and dismiss each of Plaintiff's claims with prejudice.

Respectfully submitted,

DINSMORE & SHOHL LLP


*/s/ Louise M. Griffin*
Michael Rabinowitch
211 North Pennsylvania Street, Suite 1800
Indianapolis, Indiana 46204
Telephone: (317) 860-5372
Facsimile: (317) 639-6444
misha.rabinowitch@dinsmore.com

Louise M. Griffin (*pro hac vice*)
255 E. Fifth Street, Suite 1900
Cincinnati, Ohio 45202
Telephone: (513) 977-8656
Facsimile: (513) 977-8141
<u>louise.griffin@dinsmore.com</u>


*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 5, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will automatically send notice of this filing to all attorneys of record.

*s/Louise M. Griffin*
Louise M. Griffin